IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAE BASTOCK<br>43315 Oberlin-Elyria Road<br>Oberlin, Ohio 44074 | )<br>)<br>)<br>) | CASE NO: 1:21-cv-1434<br><br>JUDGE |
| Plaintiff, | )<br>) | |
| vs. | )<br>) | **COMPLAINT** |
| BOARD OF EDUCATION OF THE<br>LORAIN CITY SCHOOL DISTRICT<br>2601 Pole Avenue<br>Lorain, Ohio 44052 | )<br>)<br>)<br>)<br>) | (Jury Demand Endorsed Herein) |
| -and- | )<br>) | |
| GREGORY D. RING, OFFICIALLY AS<br>FORMER INTERIM CHIEF EXECUTIVE<br>OFFICER OF THE LORAIN CITY<br>SCHOOL DISTRICT AND<br>INDIVIDUALLY<br>126 31st Street NW<br>Canton, Ohio 44709 | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| -and- | )<br>) | |
| MARK BALLARD, OFFICIALLY AS<br>PRESIDENT OF THE BOARD OF<br>EDUCATION OF THE LORAIN CITY<br>SCHOOL DISTRICT AND<br>INDIVIDUALLY<br>2601 Pole Avenue<br>Lorain, Ohio 44052 | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

Plaintiff Rae Bastock, by and through undersigned counsel, as her Complaint against Defendants, states and avers the following:

**INTRODUCTION**

1. Bastock is a resident of the city of Oberlin, county of Lorain, and state of Ohio.

2. Defendant Board of Education of the Lorain City School District ("Board of Education") is the elected body corporate and politic for the Lorain City School District (the "District").

3. Defendant Gregory D. Ring is named as a Defendant both officially in his former capacity as the Interim Chief Executive Officer of the District and individually.

4. Ring is a resident of the state of Ohio.

5. At all times material herein, Ring was acting in the scope and course of his employment at the District.

6. At all times material herein, Ring was in a supervisory position over Bastock.

7. Defendant Mark Ballard is named as a Defendant both officially in his current capacity as the President of the Board of Education of the Lorain City School District and individually.

8. Ballard is a resident of the state of Ohio.

9. At all times material herein, Ballard was acting in the scope and course of his capacity as an elected official on behalf of the District.

10. At all times material herein, Ballard had significant influence over Bastock's continued employment with the District.

11. Jurisdiction is proper over Defendants pursuant to 28 U.S.C. § 1331 in that Bastock is alleging federal law claims arising under 42 U.S.C. § 1983 of the Civil Rights Act.

12. Venue is properly placed in the United States District Court for the Northern District of Ohio, Eastern Division, because it is the district court for the district, division, and county within which a substantial part of the events giving rise to the claims alleged in this Complaint occurred.

13. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTUAL ALLEGATIONS

14. Bastock incorporates by reference the allegations from the preceding paragraphs, as if fully restated herein.

15. Bastock served the District in numerous roles since her initial hire in 1995.

16. On or about June 18, 2019, Bastock was transferred by the District to serve as Executive Director of Lorain High School ("LHS") due to the resignation of the previous Executive Director.

17. Bastock was and is eminently qualified for the LHS Executive Director position, bringing to the District a career dedicated to education.

18. During her tenure as LHS Executive Director, Bastock had a sterling employment record, and was consistently lauded for her work performance.

19. In or around May 2019, while serving as Principal of Longfellow Middle School, Bastock learned through then District CEO David Hardy, that the Ohio Senate Finance Subcommittee on Primary and Secondary Education would be holding a session concerning House Bill 70.

20. House Bill 70 created academic distress commissions, which assumes control of school districts after such district receives an overall grade of F on the Ohio School Report Cards for three consecutive years.

21. The District became subject to an academic distress commission in July 2017.

22. After learning of the upcoming Ohio Senate Finance Subcommittee on Primary and Secondary Education session concerning the District's continuing control by an academic distress commission, Bastock made the decision to volunteer to offer her testimony.

23. Giving testimony in this context was not expected or required of her position as Principal of Longfellow Middle School.

24. Hardy made clear to Bastock that any decision to testify concerning House Bill 70 would be completely voluntary and was not an expectation of her position as Principal at Longfellow Middle School.

25. Bastock was not pressured by anyone at the District regarding the content of her testimony.

26. Testifying to legislative bodies was not listed as a job duty under the job description for Principal of Longfellow Middle School.

27. Testifying to legislative bodies is not a typical job duty of a middle school principal.

28. Bastock had not previously testified to a legislative body related to her employment with the District.

29. Bastock provided testimony in the May 2019 session of the Ohio Senate Finance Subcommittee on Primary and Secondary Education.

30. Bastock's testimony was made and broadcast to the general public through an open session of Ohio's legislative body.

31. Bastock's testimony was not tendered pursuant to her official duties as a middle school principal.

32. Bastock was testifying as a citizen to address a matter of public concern.

33. While Bastock did not take a stated position in her testimony, Bastock was widely viewed as aligning herself with the contingent, that included Hardy, arguing in favor of the District's continued control by an academic distress commission.

34. Another contingent, which was comprised of members of the Board of Education of the Lorain City School District, had previously testified to the Ohio Senate in favor of the District no longer being controlled by an academic distress commission.

35. On or about June 13, 2019, Bastock again volunteered to offer testimony to the Ohio Senate, this time to the Ohio Senate Education Committee in reference to House Bill 70.

36. Bastock offered her June 13, 2019 testimony voluntarily and it was made clear to her on multiple occasions that she was under no obligation by the District to testify to the Ohio Senate.

37. Around the time of her June 13, 2019 testimony, Bastock was transferred to Lorain High School to serve as the school's Executive Director.

38. The Executive Director position that Bastock was transferred to in June 2019 is similar to a typical principal position.

39. Testifying to a legislative body is not a job duty listed under the Lorain High School Executive Director job description.

40. Testifying to a legislative body is not a typical job duty of a high school principal.

41. Bastock transported herself to Columbus for her June 13, 2019 testimony.

42. Bastock was again testifying as a citizen to address a matter of public concern, namely arguing in favor of the continuation of the District's control by an academic distress commission.

43. The content of Bastock's voluntary June 13, 2019 testimony to the Ohio Senate was again at odds with the viewpoint of the Board of Education of the Lorain City School District, including the Board's President, Ballard, and another member of the Board, Tim Williams.

44. On or about December 5, 2019, Williams requested a meeting with Bastock, which took place in Bastock's office.

45. Williams told Bastock that despite his view that she was a "micro-manager," "bully," and "doesn't play nice at the table," he is still a "Rae fan."

46. Williams also told Bastock that even though he is a "Rae fan," "people are really upset" at her "because of your testimony."

47. The "testimony" that Williams was referring to was Bastock's voluntary testimony to the Ohio Senate in May 2019 and June 13, 2019.

48. Williams then commented to Rae that he wasn't sure he could save Bastock's position as Executive Director of Lorain High School due to the anger over Bastock's testimony, but there was a possibility Bastock could be transferred to another principal position within the District.

49. Bastock pushed back against Williams' intimidating comments by stating she was more than qualified for the Executive Director position at Lorain High School.

50. Williams responded by telling Bastock that "no one questions your leadership and your buildings are always successful, but you will not be judged on that. You will be judged on your testimony." Williams then proceeded to tell Bastock that she's "not on the right team."

51. Williams continued by telling Bastock that he doesn't see her at Lorain High School in the future but that he could see her at another District school. Williams commented that Superintendent and Executive Director of Lorain High School are the "two most important positions in the district," and Bastock "can't be the face of Lorain High."

52. Bastock informed Williams that it was her desire to stay at Lorain High School, and Williams responded that he didn't think that could happen because "too many people are mad at you."

53. Williams went on to tell Bastock to "don't do you, Rae," and "play the game and stay under the radar and I think I can save you."

54. During the December 5, 2019 meeting, Williams received a call from Ballard, and told Ballard, "yes, I am here with her now, it's going."

55. Ballard had full knowledge of the December 5, 2019 meeting between Williams and Bastock and helped orchestrate the meeting to intimidate and retaliate against Bastock due to her testimony in front of the Ohio Senate.

56. On or about January 9, 2020, Bastock met with the new Interim CEO of the District, Ring.

57. Ring began the meeting by noting that Bastock was a "lightning rod," and when Bastock asked Ring why he considered her a "lightning bolt," Ring told Bastock that "lots of people are very upset with you for your position and your testimony."

58. The "testimony" that Ring was referring to was Bastock's voluntary testimony to the Ohio Senate in May 2019 and June 13, 2019.

59. Bastock also brought up to Ring her December 5, 2019 meeting with Williams in which Bastock was told that her position with the District was at risk due to anger at Bastock's voluntary Ohio Senate testimony.

60. In response, Ring simply quipped that it "seems like [Williams] is being honest with you."

61. In or around early 2020, LaKimbre Brown, Chief of Schools at the District, met with Ballard to discuss a number of topics, including Bastock.

62. When Bastock's name came up in the conversation, Ballard was quick to note that "anywhere she goes, she performs," and that Bastock's school performance grades and scores are always at or near the top of the District.

63. Ballard then referred to Bastock as a "noisemaker" and referenced that members of the Board of Education disregard Bastock's strong work performance.

64. Brown then commented, "I'm glad you realize, like, when people don't look at stuff objectively. Her scores are better than anybody."

65. Ballard responded, "Absolutely, 100%."

66. After continuing to discuss Bastock's sterling performance throughout the District, Brown, referring to Bastock's Ohio Senate testimony, stated, "I know she went down there and like people are upset she went to Columbus and spoke out about that."

67. Ballard then said, "Here's what Rae did, but Rae also said, and I'm not saying this to get into a battle or a fight, but Megan went down there and talked about the results that she has had over two years and we don't need the constant change, we don't need constant change, that's a true story and we don't need to argue over that."

68. Ballard was referring to another principal who testified in front of the Ohio Senate, Megan Young-Roberts, and took a position in her testimony more closely aligned with the Board of Education that the District's improving test scores warranted removal from the academic distress commission.

69. Ballard continued, "Not only did Rae make the comment that the board was the problem, but in the community that we all live in, it got back what Rae was saying specifically about what the board needed to do, where they needed to go, how they needed to go there, so her's became more of a personal place of 'we're gonna run them all out, we're going to get them all voted off the board,' and a bunch of that other stuff in the community that you live in, it's tough when those things come out. Even though that's the way you're feeling, it tough to give the benefit of the doubt."

70. Brown replied, "No, she deserves the benefit of the doubt. People should be able to say something. They should be able to say something. We don't live in no freaking communist society. This isn't a monarchy."

71. Brown later told Ballard that, "Results should matter more than what you say to Columbus."

72. Ballard simply responded, "Ok."

73. On or about March 9, 2020, Bastock was informed by the District that her position was being eliminated.

74. The District claimed that Bastock's position was being eliminated as a result of a larger reorganization to return the District back to a "traditional school model."

75. However, the "reorganization" operated in whole as means to rid the District of individuals who had previously spoken out in favor of the continuation of the academic distress commission's control over the District.

76. Individuals who either did not testify to the Ohio Senate, or offered testimony to the Ohio Senate in line with the Board of Education's view that the District should no longer be controlled by an academic distress commission, including Young-Roberts, were given substantially similar roles with District without the need to apply or interview for the "new" positions.

77. Bastock was the only District principal who was required to interview for a "new" position within the District, and ultimately, despite applying for and showing interest in multiple District positions, was denied any employment with the District.

78. The District used the guise of a "reorganization" to unlawfully terminate Bastock's employment contract and deny her the same opportunities to continue her employment with the District that others were afforded who had not offered testimony to the Ohio Senate in conflict with the Board of Education's stated viewpoint.

## FIRST CAUSE OF ACTION
### (Violation of Civil Rights Act 42 U.S.C. § 1983)

79. Bastock incorporates by reference the allegations from the preceding paragraphs as if fully restated herein.

80. Bastock's claim against Defendants Ring and Ballard is in the individual Defendants' official and individual capacities.

81. The individual Defendants agreed and conspired to deprive Plaintiff of her rights.

82. The acts of the individual Defendants were done under color of Defendants' legal authority in retaliation for the exercise by Bastock of her rights of free speech and association.

83. The individual Defendants were managerial and executive persons whose actions and pronouncements may be fairly regards as the actions and pronouncement of the District. As a result, the acts against Bastock were impliedly approved and conducted as a matter of policy of the District.

84. In doing the acts described above, each of the Defendants was the agent of the other Defendants and was acting within the course and scope of that agency.

85. The exercise by Bastock of her core First Amendment rights of free speech in testifying in front of the Ohio Senate was a substantial factor in Defendants' retaliatory actions, including Defendants' termination of Bastock's employment.

86. Bastock's two instances of testimony in front of the Ohio Senate were protected by the First Amendment to the United States Constitution in that it was a lawful exercise of Bastock's rights of free speech.

87. Bastock's testimony in front of the Ohio Senate was not pursuant to her official duties as an employee of the District, and therefore, her testimony constituted protected speech.

88. As a result of Bastock's testimony to the Ohio Senate, Defendants subjected Bastock to adverse terms and conditions of employment including termination of her employment and refusal to restore Bastock to a comparable position as Defendants did for countless other employees who had their contracts terminated who did not similarly testify to the Ohio Senate.

89. The Defendants' actions violated Bastock's First Amendment rights under the United States Constitution and 42 U.S.C. § 1983.

90. Bastock is entitled to lost wages and benefits, compensatory damages, punitive damages, and attorney's fees and costs as a result of Defendants' violation of 42 U.S.C. § 1983.

## CONCLUSION

Plaintiff Rae Bastock seeks judgment against Defendants in an amount in excess of $75,000 to fully, fairly, and justly compensate her for injury, damage, and loss, and respectfully prays that this Court enter judgment in her favor and award her past and future economic and non-economic compensatory damages, fringe benefits, consequential damages, incidental damages, punitive damages, liquidated damages, interest, all reasonable attorney's fees, costs and expenses, and any additional legal or equitable relief available under law.

Respectfully Submitted,

/s/ *Sean H. Sobel*
Sean H. Sobel (0086905)
Claire I. Wade-Kilts (0093174)
Sobel, Wade & Mapley, LLC
55 Erieview Plaza, Suite 370
Cleveland, Ohio 44114
T: (216) 223-7213
F: (216) 223-7213
sobel@swmlawfirm.com
wade@swmlawfirm.com

*Counsel for Plaintiff Rae Bastock*

## **JURY DEMAND**

Plaintiff Rae Bastock demands a trial by jury by the maximum number of jurors permitted.

/s/ *Sean H. Sobel*
Sean H. Sobel (0086905)

*Counsel for Plaintiff Rae Bastock*